1          UNITED STATES DISTRICT COURT

2             DISTRICT OF OREGON

3            PORTLAND DIVISION

4

5 CHEHALEM PHYSICAL THERAPY, INC.)
  and SOUTH WHIDBEY PHYSICAL    )
6 THERAPY AND SPORTS CLINIC,    )        No. 09-cv-00320-HU
                                )
7              Plaintiffs,      )
                                )    **ORDER ON PLAINTIFF'S MOTION**
8 vs.                           )     **FOR SUMMARY JUDGMENT AND**
                                )      **MOTION TO CERTIFY CLASS**
9 COVENTRY HEALTH CARE, INC.,   )
                                )
10             Defendant.       )

11

12 Arthur M. Murray
   Stephen B. Murray
13 Stephen B. Murray, Jr.
   Korey A. Nelson
14 MURRAY LAW FIRM
   650 Poydras Street, Suite 2150
15 New Orleans, LA 70130

16 Diana E. Godwin
   LAW OFFICE OF DIANA GODWIN
17 1500 N.E. Irving Street, Suite 370
   Portland, OR 97232
18
   Joseph Payne Williams, Sr.
19 Richard Bray Williams
   WILLIAMS FAMILY LAW FIRM, LLC
20 162 Jefferson Street
   Natchitoches, LA 71457    `
21
   Steve D. Larson
22 Joshua L. Ross
   STOLL STOLL BERNE LOKTING & SCHLACHTER, P.C.
23 209 S.W. Oak Street, Fifth Floor
   Portland, OR  97204
24
   Thomas A. Filo
25 COX COX FILO CAMEL & WILSON, LLC
   723 Broad Street
26 Lake Charles, LA 70601

27     Attorneys for Plaintiffs

28

1 09-cv-00320 Order

1  John F. McGrory, Jr.
   DAVIS WRIGHT TREMAINE, LLP
2  1300 S.W. Fifth Avenue, Suite 2300
   Portland, OR 97201-5630
3
   Jennifer A. Adler
4  Lisa L. Heller
   V. Robert Denham, Jr.
5  ROBINS KAPLAN MILLER & CIRESI, LLP
   2600 One Atlanta Plaza
6  650 East Paces Ferry Road, N.E.
   Atlanta, GA 30326
7
        Attorneys for Defendant
8

9

10

11

12  HUBEL, Magistrate Judge:

13        This matter is before the court on motion of the plaintiffs

14  Chehalem Physical Therapy, Inc. ("Chehalem") and South Whidbey

15  Physical Therapy and Sports Clinic ("South Whidbey") for summary

16  judgment, Dkt. #148, and the plaintiffs' motion for class

17  certification, Dkt. #151.

18        Coventry Health Care, Inc. ("Coventry") enters into preferred

19  provider organization (PPO) agreements with health care providers

20  who agree to allow bills for their services to be discounted in

21  exchange for membership in the PPO network.  Coventry then markets

22  the PPO network to third-party payors such as health insurers,

23  third-party administrators for self-insured employers, and workers'

24  compensation insurers.  Coventry enters into contracts with these

25  payors that allow the payors to apply the applicable discount to

26  charges for medical care submitted by the PPO providers.

27        Typically, a provider submits a bill to a payor, such as a

28  workers' compensation insurance company.  The payor then reviews

2 09-cv-00320 Order

1 the provider's bill to determine the amount payable under the state
2 workers' compensation laws and regulations, arriving at an amount
3 referred to as the Workers' Compensation Allowable, or WCA.  The
4 WCA may be based on a state fee schedule, a lesser of the state fee
5 schedule and the billed charge, or some other measure, such as
6 "usual and customary" fees or charges.  The bill review function
7 also may be performed by a separate third party with whom the payor
8 has contracted to perform that function.  In some cases, Coventry
9 contracts with payors to perform this bill review function.

10     After the WCA is determined, the bill information and the WCA
11 are submitted to Coventry, which uses its proprietary bill
12 calculation software, known as the "MCPS," to determine whether the
13 provider is a member of the PPO network and has agreed to a
14 discounted payment.  If the provider is in the PPO network, MCPS
15 re-prices the bill in accordance with the payment methodology
16 contained in that provider's agreement.  The bill then is returned
17 to the payor with the amount of the discount that can be taken
18 under the provider agreement.  The payor makes the final deter-
19 mination of payment, including whether to apply the PPO discount as
20 determined by the MCPS, and sends the payment and an Explanation of
21 Benefits (EOB) or Explanation of Reimbursement (EOR) to the
22 provider.  The EOB/EOR details the payment made and the reasons for
23 any discount.

24     This case involves PPO contracts entered into between the
25 plaintiffs and First Health Group Corp. ("First Health"), a
26 Coventry subsidiary.  The plaintiffs contracted with First Health
27 to participate in the First Health Provider Network – a PPO network
28 maintained by First Health.  Chehalem entered into a First Health

Network Participating Clinic Agreement ("Provider Agreement") in July 1998.  It terminated its Provider Agreement prior to filing this lawsuit.    South Whidbey entered into a similar Provider Agreement in January 2007, and its Provider Agreement remains in effect.

The reimbursement provision of the Provider Agreement entered into by each of the plaintiffs provides, in pertinent part:

> **§4.2  Reimbursement Procedure**
>
> The rules and procedures for reimbursement under this Agreement are as follows:
>
> (a)  Pursuant to each Payor's Payor Agreement with First Health, Payor shall be liable for the lesser of Provider's billed charges or the amount set forth in Appendix A of this Agreement, less amounts of any copayments, deductibles, and coordination of benefits, when Covered Medical Services are provided to a Participating Patient.
>
> (b)  In no case shall reimbursement exceed Provider's billed charges.

Dkt. #160-12, ECF p. 7; Dkt. #160-17, ECF pp. 7-8.

Appendix A is different for each of the plaintiffs' Provider Agreements.  Chehalem's Appendix A provides, in pertinent part:

> D.  Reimbursement from Workers' Compensation Payors for services rendered to occupationally ill/injured employees shall be as follows:
>
> (1) If any state law or regulation establishes rules or guidelines for the payment of health care services, reimbursement shall not exceed 80% of the maximum amount payable under such rules or guidelines. . . .  This rate of reimbursement shall apply whether such rules or guidelines are in existence at the time of execution of this agreement or established at a later time.

4 09-cv-00320 Order

           (2)  In the absence of any state law or regulation set forth in Section D, paragraph (1), . . . in no event shall reimbursement exceed the usual and customary charge for the services as determined by First Health or Payor.

    E.  In no case shall reimbursement exceed Provider's usual and customary charge for the services rendered.

Dkt. #160-17, ECF p. 15.

South Whidbey's Appendix A provides, in pertinent part:

    A.  Services shall be reimbursed at **90% of the amounts specified in 2005 Medicare Fee Schedules** as adjusted and supplemented by First Health, except for those services defined under Sections B or C below. [Sections B and C specify particular rates for the provision of Medical Anesthesia services and Durable Medical Equipment. Section D further specifies how these services are billed.]

    E.  Reimbursement from Workers' Compensation Payors for services rendered to occupationally ill/injured employees shall be the lesser of the amounts specified in Sections A, B, C and D above or **80%** of the amount specified as the maximum amount payable under any related state or federal law or regulation pertaining to payment for such services or the usual and customary fee for the services as established by First Health or Payor. This rate of reimbursement shall apply whether such rules or guidelines are in existence at the time of execution of this agreement or established at a later time.

              *   *   *

    G.  In no case shall reimbursement exceed Provider's usual and customary charge for the services rendered.

Dkt. #160-12, ECF p. 17 (emphasis in original).

At issue in this case is Coventry's calculation of the discounts the plaintiffs agreed to for the provision of services to

5 09-cv-00320 Order

1 injured workers who are eligible for workers' compensation
2 benefits.  The plaintiffs claim that whenever a provider submits a
3 bill for workers' compensation medical services that is less than
4 the amount specified by the applicable state workers' compensation
5 fee schedule, Coventry's MCPS system impermissibly recommends
6 taking the applicable PPO discount off of the actual billed charge.
7 The plaintiffs claim this practice is a breach of their Provider
8 Agreements.

9    Before the parties consented to entry of final judgment by a
10 Magistrate Judge, Coventry filed a motion for summary judgment.  I
11 filed Findings and Recommendation, recommending Coventry's motion
12 for summary judgment be denied.  Dkt. #53.  The Honorable Anna J.
13 Brown adopted my Findings and Recommendation, and denied Coventry's
14 motion.  Dkt. #58.  The parties subsequently consented to jurisdic-
15 tion and entry of final judgment by a Magistrate Judge pursuant to
16 28 U.S.C. § 636(c).  Dkt. #70.

17    The case now is before the court on the plaintiffs' motion for
18 summary judgment, and their motion to certify an Injunctive Class.
19 Dkt. ##148 & 151.  I will address each of the motions separately.

20

21                    ***MOTION FOR SUMMARY JUDGMENT***

22    With the addition of South Whidbey to the case, and the
23 availability of deposition excerpts submitted by the parties in
24 which their witnesses describe how the plaintiffs, themselves, have
25 been interpreting the Provider Agreements in the course of their
26 businesses, I begin analysis of the current motions by taking a
27 fresh look at the applicable contract provisions.  In looking at
28 the contract provisions anew, I have reached the conclusion that

6 09-cv-00320 Order

certain of my findings in connection with Coventry's previous
motion for summary judgment were in error. While the result would
not be affected - i.e., denial of Coventry's motion for summary
judgment still was appropriate – I find good cause exists to modify
my previous findings.

In general, "[a]s long as a district court has jurisdiction
over [a] case, then it possesses the inherent procedural power to
reconsider, rescind, or modify an interlocutory order for cause
seen by it to be sufficient." *City of Los Angeles, Harbor Div. v.
Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) (internal
quotation marks, emphasis, citations omitted); *see In re Saffady*,
524 F.3d 799, 803 (6th Cir. 2008) (district court has "inherent
power to reconsider interlocutory orders and reopen any part of a
case before entry of a final judgment"; internal quotation marks,
citations omitted).  This power "is derived from the common law,
not from the Federal Rules of Civil Procedure." *Santa Monica
Baykeeper*, 254 F.3d at 886 (citations omitted).  As observed by the
Third Circuit Court of Appeals, "'the power to grant relief from
erroneous interlocutory orders, exercised in justice and good
conscience, has long been recognized as within the plenary power of
courts until entry of final judgment and is not inconsistent with
any of the Rules.'"  Id., 254 F.3d at 885(quoting *United States v.
Jerry*, 487 F.2d 600, 604 (3d Cir. 1973)).

The court's power to reconsider its own interlocutory orders
is not impinged upon by the "law of the case doctrine," which,
though generally adhered to, is discretionary rather than manda-
tory.  *Id.*, 254 F.3d at 888 (citing, *inter alia*, *United States v.
Houser*, 804 F.2d 565, 567 (9th Cir. 1986) ("All rulings of a trial

7 09-cv-00320 Order

1  court are 'subject to revision at any time before the entry of
2  judgment.'")).  *See Gonzalez v. Arizona*, 624 F.3d 1162, 1185-87
3  (9th Cir. 2010) ("'[l]aw of the case should not be applied woodenly
4  in a way inconsistent with substantial justice'") (quoting *United*
5  *States v. Miller*, 822 F.2d 828, 832 (9th Cir. 1987); additional
6  citations omitted).

7       For the reasons discussed below, I now find substantial
8  justice would be served by modifying my earlier findings in
9  connection with Coventry's motion for summary judgment.

10      In my Findings and Recommendation on Coventry's motion for
11 summary judgment, I examined the terms of the PPO Agreement between
12 Chehalem and Coventry.  Certain of my findings are set forth here
13 in full because the plaintiffs rely heavily on those findings in
14 their present motion for summary judgment.

15      As a preliminary matter, I discussed the Oregon guidelines for
16 payment of medical services provided to injured workers:

17           Oregon's Department of Consumer and
             Business Services, Workers' Compensation Divi-
18           sion (the Department) promulgated Medical Fee
             and Payment Rules (Payment Rules) for estab-
19           lishing "uniform guidelines for administering
             the payment for medical services to injured
20           workers within the workers' compensation
             system."  OAR 436-009-002.  Included in the
21           Payment Rules is a fee schedule.

22           The Payment Rules provide, "Insurers must
             pay for medical services at the provider's
23           usual fee or according to the fee schedule,
             whichever is less, unless otherwise provided
24           by contract or fee discount agreement per-
             mitted by these rules."  OAR 436-009-0040(1).
25           Effective January 1, 2009, amended Payment
             Rules prohibit all fee discounts for medical
26           services that are part of contracts between
             providers and PPOs:
27
             [A]n insurer may only apply the following
28           discounts to a medical service provider's

8 09-cv-00320 Order

> or clinic's fee: (a) A fee agreed to
> under a fee discount agreement that con-
> forms to this rule and has been reported
> to the director; or (b) a fee agreed to
> by the medical service provider or clinic
> under an MCO [managed care organization]
> contract to cover services provided to a
> worker enrolled in the MCO.
>
> OAR 436-009-0018(1)(a) and (b). . . .

Dkt. #53, pp. 3-4.  Thus, effective January 1, 2009, the reim-
bursement procedure set forth in the plaintiffs' Provider Agreement
no longer applies in Oregon for reimbursement of workers' compen-
sation services.

I then discussed Coventry's Provider Agreement in the context
of Coventry's motion for summary judgment:

> Coventry moves for summary judgment in
> its favor on Chehalem's individual claim for
> breach of contract, asserting that even
> assuming the truth of Chehalem's allegation
> that Coventry improperly paid 80% of its
> billed charges when the billed charges were
> less than the fee schedule, rather than 80% of
> the fee schedule, the discount was permitted
> under the plain meaning of the Provider
> Agreement's terms.
>
> The contract . . . provides as follows:
>
> **§4.2  Reimbursement procedure**
>
> (a) Pursuant to each Payor's Payor Agree-
> ment with First Health, Payor shall be
> liable for **the lesser of Provider's
> billed charges or the amount set forth in
> Appendix A of this Agreement,** less
> amounts of any copayments, deductibles,
> and coordination of benefits, when
> Covered Medical Services are provided to
> a Participating Patient.
>
> (b) In no case shall reimbursement exceed
> Provider's billed charges.
>
> [Citation omitted.]  Appendix A provides, in
> pertinent part:

9 09-cv-00320 Order

D.   Reimbursement from Workers' Compensation Payors for services rendered to occupationally ill/injured employees shall be as follows:

(1) If any state law or regulation establishes rules or guidelines for the payment of health care services, reimbursement shall not exceed 80% of the maximum amount payable under such guidelines. . . .

E.   In no case shall reimbursement exceed Provider's usual and customary charge for the services rendered.

*    *    *

Coventry argues that the Payment Rules provide that the "maximum amount payable" for any single service is the lesser of the provider's billed charge for that service or the amount specified in the state's fee schedule. Where the billed charge is less than the fee schedule amount, then that billed charge is the "maximum amount payable" under the Payment Rules. Accordingly, says Coventry, under the terms of the Provider Agreement, the payment amount under the Agreement "shall not exceed 80% of that 'maximum amount payable.'"

Chehalem responds that Coventry's motion for summary judgment should be denied either because Coventry's interpretation of the Provider Agreement is unreasonable, or because the Provider Agreement is ambiguous. I do not find the Provider Agreement ambiguous, but I agree with Chehalem that Coventry's interpretation of the Provider Agreement is unreasonable. First, the "maximum amount payable" clause in the Provider Agreement only refers to the fee schedule, not the provider's billed charge ("reimbursement shall not exceed 80% of the **maximum amount payable under such guidelines**.") Second, Coventry is mistaken when it asserts that where the billed charge is less than the fee schedule amount, that billed charge is the "maximum amount payable." The Provider Agreement specifically provides that the amount payable is the **lesser** of **either** the provider's billed charge or 80% of the state's fee schedule amount, as provided in Appendix A. Nothing in the Provider Agreement or the Oregon administrative rules

10 09-cv-00320 Order

permits Coventry to discount the provider's billed charge. [Footnote omitted.]

Neither the plain language of the Provider Agreement, nor anything in the Payment Rules says that payment shall not exceed the lesser of 80% of the provider's billed charges or 80% of the state's fee schedule amount.

The Provider Agreement states that "[i]n no case shall reimbursement exceed Provider's billed charges." As Chehalem points out, Coventry's interpretation of the Provider Agreement would make this provision surplusage, because the Provider Agreement would *never* even allow full reimbursement of the billed charges--they would always be discounted, as would the state's fee schedule amount.

Coventry's interpretation is also contrary to the express language of the Provider Agreement which states that the amount reimbursed is to be the lesser of the Provider's billed charges **or** the amount set forth in Appendix A. The amount set forth in Appendix A--80% of the state's fee schedule amount--is, by use of the word "or" clearly an alternative to "the Provider's billed charges." "The Provider's billed charges" cannot reasonably be interpreted to mean "80% of the Provider's billed charges."

And finally, Coventry's proposed interpretation of the Provider Agreement is contrary to its own Concise Statement of Fact:

9.   Under the terms of the Provider Agreement, the payment for a particular medical service shall be the lesser of the provider's billed charge amount for that service, or 80% of the "maximum amount payable" under a particular state's rules and guidelines.

10.  To ascertain the correct reimbursement rate under the terms of the Provider Agreement, it is necessary to compare the billed charge amount with 80% of the "maximum amount payable" under the State of Oregon's payment rules and guidelines. The payment under the Provider Agreement is the lesser of those two amounts.

1  Dkt. #53, pp. 4-7 (emphasis in original).

2      The plaintiffs rely heavily, in their current motion for
3  summary judgment, on my findings that (1) the Provider Agreement is
4  not ambiguous, and (2) "Coventry's interpretation of the Provider
5  Agreement is unreasonable." I now rescind both of those findings.
6  My decision to do so is based on a plain reading of the
7  reimbursement provisions in Appendix A to each of the plaintiffs'
8  Provider Agreements, which, I have determined, are subject to
9  multiple interpretations.  Both of the plaintiffs' Provider
10 Agreements specify the same Reimbursement Procedure in section 4.2;
11 i.e., payment will be made based on "the lesser of Provider's
12 billed charges or the amount set forth in Appendix A." The "amount
13 set forth in Appendix A" is where the ambiguity arises.

14     I begin by examining Appendix A to Chehalem's Provider
15 Agreement.   Chehalem's Appendix A provides two reimbursement
16 schemes - one when there are applicable state rules or guidelines,
17 and one in the absence of such state rules or guidelines.  Where
18 there are state rules or guidelines, then the reimbursement amount
19 is 80% of the maximum amount payable under those rules or
20 guidelines.  Oregon's "uniform guidelines" that were in effect
21 prior to January 1, 2009, specified that insurers had to pay for
22 medical services at the lesser of (a) the provider's "usual fee,"
23 or (b) the amount set forth on the fee schedule included in the
24 state's Payment Rules.  *See* OAR 436-009-0040(1).  Thus, under
25 Chehalem's Appendix A as it applied in Oregon prior to January 1,
26 2009, the "maximum amount payable," to which the 80% discount
27 applied was defined as "the lesser of" the provider's "usual fee,"
28 or the fee schedule amount.  (Notably, the provider's "usual fee"

1  may be more or less than, or equal to, the amount billed.)  So
2  Chehalem's Appendix A says reimbursement will be 80% of the of the
3  lesser of two numbers.

4      Neither of the parties has offered an interpretation of these
5  provisions that makes sense.  Under the current scheme that
6  specifies how First Health gets its information from the bill
7  reviewers, there is no way First Health ever could know which is
8  greater, the fee schedule amount or the Provider's "usual" fee.  As
9  a result, there is no way First Health could determine the "lesser
10 of" the Provider's billed charge or the amount specified in
11 Appendix A.  It is hard to imagine how this language could be more
12 ambiguous.

13     South Whidbey's Provider Agreement, like Chehalem's, provides
14 that reimbursement will be the lesser of the Provider's billed
15 charges or the amount set forth in Appendix A.  However, South
16 Whidbey's Appendix A is even more of a labyrinth than Chehalem's.
17 Under paragraph E of South Whidbey's Appendix A, workers'
18 compensation services are to be reimbursed at the lesser of (1)
19 "90% of the amounts specified in [the] 2005 Medicare Fee
20 Schedules," or (2) "80% of the amount specified as the maximum
21 amount payable under any related state or federal law or regulation
22 pertaining to payment for such services or the usual and customary
23 fee for the services as established by First Health or Payor."
24 This second clause is beyond comprehension.  First, there is the
25 same problem discussed above with regard to Chehalem's Appendix A;
26 i.e., the problem of determining what constitutes "the maximum
27 amount payable" under the applicable state or federal law or
28 regulation.  Second, South Whidbey's Appendix A throws a new wrench

13 09-cv-00320 Order

1 into the works; i.e., determining what constitutes "the usual and
2 customary fee for the services as established by First Health or
3 Payor."

4       Under the scheme in South Whidbey's Appendix A, in order to
5 determine the proper rate of reimbursement, one would have to make
6 a number of determinations:

7       1.    What is the billed charge?

8       2.    What is the amount specified in the 2005 Medicare Fee
9 Schedules for the particular service in question, multiplied by
10 90%?

11      3.    What is the "maximum amount payable" under the applicable
12 state or federal law or regulation pertaining to payment for such
13 services, multiplied by 80%?  To determine this amount requires an
14 examination of Washington's payment scheme for workers' compensa-
15 tion services, and specifically, with regard to South Whidbey, the
16 regulations for payment of physical therapy services.  Among other
17 things, those regulations establish a fee schedule for "all
18 services for accepted industrial insurance claims."  WAC § 296-20-
19 010(1) (Dkt. #160-14, ECF p. 3).  Providers are directed to "bill
20 their usual and customary fee for services.  If a usual and
21 customary fee for any particular service is lower to the general
22 public than listed in the fee schedules, the practitioner shall
23 bill the [D]epartment [of Labor and Industries] or self-insurer at
24 the lower rate.  The department or self-insurer will pay the lesser
25 of the billed charge or the fee schedules' maximum allowable."  *Id.*
26 Therefore, the maximum amount payable under the Washington
27 regulations will be the provider's actual charge or the amount
28 listed on the fee schedule, whichever is less.

14 09-cv-00320 Order

1    However, where physical therapy services are concerned, the

2  Washington regulations impose an additional limitation when more

3  than one physical therapy treatment is performed in a single day:

4              The department or self-insurer will pay
           for a maximum of one physical therapy visit
5           per day.  When multiple treatments (different
           billing codes) are performed on one day, the
6           department or self-insurer will pay either the
           sum of the individual fee maximums, the pro-
7           vider's usual and customary charge, or $118.07
           whichever is less. . . .

8

9  WAC § 296-23-220 Physical therapy rules (Dkt. #160-13, ECF p. 2).

10 Thus, when more than one treatment is performed, the maximum amount

11 payable under the state regulations will be the lesser of (1) the

12 sum of the maximum fee schedule amounts for all of the treatments

13 performed; (2) the provider's usual and customary charge (pre-

14 sumably, the amount billed), again for all treatments; or (3)

15 $118.07 (or the daily cap amount for the time period in question;

16 *see* former versions of WAC 296-23-220).

17    4.   What is "the usual and customary fee for the services as

18 established by First Health or Payor," multiplied by 80%?   The

19 "usual and customary fee for the services as established by First

20 Health or Payor" could differ from South Whidbey's usual and

21 customary fee; the "usual and customary fee" determined by First

22 Health could differ from that established by the Payor; or other

23 differences could exist; all depending on the type(s) of treat-

24 ment(s) performed, and the particular Payor to whom the bill is

25 addressed.   There is nothing in the Record on this issue in

26 connection with the current motions.

27    5.   Which is the lowest amount of the answers to questions 2,

28 3, and 4?

15 09-cv-00320 Order

1      6.   Which is the lower amount - the answer to question 1 or
2 the answer to question 5?
3      7.   Which is the lower amount - the answer to question 6 or
4 the Provider's actual bill?
5      8.   Further, just how is the WCA determined under this
6 scheme?  According to the plaintiffs, when a provider sends a bill
7 to a payor, the payor's bill reviewer (whether the payor itself, or
8 a third-party vendor) computes the WCA by referring to the
9 applicable state fee schedule, rules, and regulations.  *See* Dkt.
10 #154-10, ECF p. 6 (Depo. of Karren Lopez, p. 43).  Then the WCA and
11 the provider's bill are transmitted to the MCPS system.  However,
12 under the scheme set out in South Whidbey's Appendix A, it is not
13 clear how the "usual and customary fee for the services as
14 established by First Health or Payor" comes into play.  Is the
15 answer to question 6, above, considered to be the WCA?  Coventry's
16 employee Anne DeLeers testified that the MCPS system "only use[s]
17 the [WCA]," which is not the same thing as the "maximum amount
18 payable" under the applicable state guidelines and regulations.
19 *See* Dkt. #154-8, ECF pp. 16 & 20 (DeLeers Depo., March 22, 2010,
20 pp. 59 & 65).  It would appear that, in some cases, application of
21 the scheme specified in South Whidbey's Appendix A would result in
22 the provider's billed amount being equal to the amount determined
23 to be the WCA.  In such a case, under South Whidbey's contract, it
24 appears the amount payable may be the lesser of "90% of the amounts
25 specified in [the] 2005 Medicare Fee Schedules," or 80% of the
26 provider's billed amount.  However, this result is not clear.
27      If the above discussion is "clear as mud," it only underscores
28 my conclusion that the Provider Agreement is ambiguous.  As a

16 09-cv-00320 Order

1  result, I cannot find, as a matter of law, that Coventry's inter-
2  pretation of the Provider Agreement was unreasonable.  Indeed,
3  Coventry's interpretation would appear to be just as reasonable as
4  the plaintiffs'.

5      Under Illinois law, which the parties agree governs this
6  dispute, the terms of the Provider Agreement should be construed,
7  insofar as possible, to "give effect to the intention of the
8  parties at the time they entered into the contract." *Village of*
9  *Palatine v. Palatine Assocs., LLC*, ___ N.E. 2d ___, 2012 WL 933420,
10 at *10 (Ill. App. Ct. Mar. 16, 2012) (citations omitted).  When, as
11 here, the parties disagree as to the meaning of a particular
12 provision of a contract, "the threshold issue is whether the
13 contract is ambiguous." *Id.* (internal quotation marks, citations
14 omitted).  However, simply because the parties disagree as to the
15 meaning of a contract provision does not make the provision
16 ambiguous.  "Contractual language is ambiguous when it is suscep-
17 tible to more than one meaning or is obscure in meaning through
18 indefiniteness of expression." *Id.*  "The question whether the
19 language of a contract is ambiguous . . . is a question of law."
20 *Regency Commercial Assocs., LLC v. Lopax, Inc.*, 869 N.E.2d 310, 316
21 (Ill. App. Ct. 2007) (citing *River's Edge Homeowners' Ass'n v. City*
22 *of Naperville*, 819 N.E.2d 806, 809-10 (2004)).

23     I find the language of both plaintiffs' Provider Agreements on
24 the record of this motion to be susceptible to more than one
25 reasonable interpretation and, therefore, to be ambiguous.  Having
26 so found, the next question concerns the proper remedy under
27 Illinois law.  Coventry argues the meaning of the Provider
28 Agreement should be determined by the jury.  Coventry also asserts

1  a finding that the contract is ambiguous is tantamount to a finding
2  that a genuine issue of material fact exists, making summary
3  judgment "*per se* inappropriate." Dkt. #169, pp. 2-3 (citing *City*
4  *of Chicago v. Dickey*, 497 N.E.2d 490, 736-39 (Ill. App. Ct. 1986)).
5
6      The plaintiffs argue that if the court finds an ambiguity, the
7  court "examines extrinsic evidence and construes the ambiguity
8  against the drafter." Dkt. #170, p. 2.  They argue if construing
9  the language against the drafter results in only one meaning, then
10 "'the court need not resort to inquiry by the trier of fact, but
11 must determine the meaning of the contract as a question of law.'"
12 Dkt. #170, p. 3 (quoting *Nerone v. Boehler*, 340 N.E.2d 534, 537
13 (Ill. App. Ct. 1976)).
14     My review of Illinois law leads to the following principles.
15 If a contract is found to be ambiguous, summary judgment is
16 inappropriate.  *See Gassner v. Raynor Mfg. Co.*, 948 N.E.2d 315,
17 1012 (Ill. App. Ct. 2011). Under Illinois law, the trier of fact –
18 in this case, the jury – examines the extrinsic evidence to
19 determine the parties' intent. *Nerone v. Boehler*, 340 N.E.2d 534,
20 537 (Ill. App. Ct. 1976).  "If the language of an agreement is
21 facially unambiguous, then the trial court interprets the contract
22 as a matter of law without the use of extrinsic evidence.  However,
23 if the language of the contract is susceptible to more than one
24 meaning, than an ambiguity is present, and parol evidence may be
25 admitted **to aid the trier of fact** in resolving the ambiguity."
26 *Lease Mgmt. Equip. Corp. v. DFO Partnership*, 910 N.E.2d 709, 715
27 (Ill. App. Ct. 2009) (citations omitted) (emphasis added).
28

18 09-cv-00320 Order

1    The plaintiffs argue the trier of fact need not examine
2 extrinsic evidence at all in this case because the four corners of
3 the contract are clear, ending the inquiry.  As illustrated by the
4 discussion above, however, the "plain language" of the Provider
5 Agreement is anything but "plain," and is difficult, at best, to
6 understand.  Having found the contract language to be ambiguous,
7 determining the parties' intent is for the jury, not the court.
8 *See id.*; *Dean Mgmt, Inc. v. TBS Const., Inc.*, 790 N.E.2d 934, 940
9 (Ill. App. Ct. 2003) (same).  The jury's task will be to construe
10 the contract "in accordance with the ordinary expectations of
11 reasonable people." *Carey v. Richards Bldg. Supply Co.*, 856 N.E.2d
12 24, 28 (Ill. App. Ct. 2006) (citations omitted). *See id.* ("Because
13 contracts are interpreted objectively, the question of what a
14 reasonable person would take the agreement to mean is relevant.").

15    Accordingly, the plaintiffs' motion for summary judgment is
16 **denied.**  This ruling renders moot Coventry's argument that the
17 Declaration of Diana Godwin (Dkt. #153) is improper and should not
18 be considered by the court.

19

20              *MOTION TO CERTIFY AN INJUNCTIVE CLASS*

21    Chehalem originally brought this action as a single plaintiff,
22 seeking to certify both a Damages Class and an Injunctive Class.
23 However, due to changes in Oregon's administrative rules, as well
24 as termination of the PPO agreement between Chehalem and Coventry,
25 Chehalem's class allegations pertaining to the Injunctive Class
26 were dismissed.  Chehalem then filed a motion to certify a Damages
27 Class, which I denied.  I analyzed the issues in detail and found
28 that although Chehalem had met its burden under Federal Rule of

1 Civil Procedure 23(a) to show numerosity of the class members and
2 adequacy of Chehalem as class representative, it had failed to meet
3 its burden to show commonality of claims and predominance of common
4 issues of fact or law.  I further found it was not feasible to
5 ascertain the identities of the proposed class members. Dkt. #127.

6      Chehalem moved to amend its Complaint to add South Whidbey as
7 a plaintiff, for purposes of bringing both an individual damages
8 claim on its own behalf, and also to act as the representative
9 plaintiff in a class action for injunctive relief.  I granted the
10 motion to add South Whidbey to the case, but noted that whether the
11 plaintiffs would be able to show the viability of an Injunctive
12 Class under Federal Rule of Civil Procedure 23(b)(2) was an issue
13 that had to await the plaintiffs motion to certify that class.
14 *Id.*, p. 10.  The plaintiffs' current motion for class certifica-
15 tion, Dkt. #51, seeks certification of a class consisting of:

16         all health care providers who have a First
          Health PPO Provider Agreement that provides
17         for the payment of the lesser of the billed
          charge or a discount based on a percentage of
18         the maximum payable amount under the appli-
          cable state's workers' compensation fee
19         schedule and after applying any applicable
          state rules or guidelines.  Excluded from the
20         class are health care providers in the state
          of Louisiana.
21
22 Dkt. #15, p.; 2.

23      "The decision to grant or deny class certification is within
24 the trial court's discretion." *Bateman v. American Multi-Cinema,*
25 *Inc.*, 623 F.3d 708, 712 (9th Cir. 2010) (citing *Yamamoto v. Omiya*,
26 564 F.2d 1319, 1325 (9th Cir. 1977)).  To obtain certification of
27 the Injunctive Class requested by the plaintiffs, it is the
28 plaintiffs' burden to meet all four of the requirements under

1  Federal Rule of Civil Procedure 23(a), and to "establish an
2  appropriate ground for maintaining class actions under Rule 23(b)."
3  *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1019 (9th Cir. 2011).
4  Here, where the plaintiffs seek to certify an Injunctive Class, the
5  applicable provision of Rule 23(b) is subsection (2): "the party
6  opposing the class has acted or refused to act on grounds that
7  apply generally to the class, so that final injunctive relief or
8  corresponding declaratory relief is appropriate respecting the
9  class as a whole[.]"  Fed. R. Civ. P. 23(b)(2).

10      The court must conduct a "rigorous analysis" to determine
11  whether the plaintiffs have met the prerequisites of Rule 23 before
12  certifying a class.  *Wal-Mart Stores, Inc. v. Dukes*, ___ U.S. ___,
13  131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011); *Mazza v. American
14  Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (citing *Zinser
15  v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186, *amended* 273
16  F.3d 1266 (9th Cir. 2001)).  Here, the court finds the required
17  "rigorous analysis" cannot be made until after the jury has
18  interpreted the contract.

19      Accordingly, the court **reserves** ruling on the plaintiffs'
20  motion for class certification until after trial on the contractual
21  interpretation issue.

22

23                          ***CONCLUSION***

24      For the reasons discussed above, the plaintiffs' motion for
25  summary judgment, Dkt. #148, is **denied**, and the court **reserves**

26

27

28

21 09-cv-00320 Order

1  **ruling** on the plaintiffs' motion for class certification,

2  Dkt. #151.

3      IT IS SO ORDERED.

4                                  Dated this 18th day of June, 2012.

5                                  /s/ Dennis J. Hubel

6                                  _____

7                                  Dennis James Hubel
                                   Unites States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28